# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Kristopher T. T.,

       Plaintiff,

v.

Martin J. O'Malley,
Commissioner of Social Security
Administration,[1]

       Defendant.

Case No. 23-cv-359 (TNL)

**ORDER**

---

Edward A. Wicklund, Olinsky Law Group, 250 South Clinton Street, Suite 210, Syracuse, NY 13202; and Jyotsna Asha Sharma, Disability Partners, PLLC, 2579 Hamline Avenue North, Suite C, Roseville, MN 55113 (for Plaintiff); and

Ana H. Voss, Assistant United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415; and James Potter and James D. Sides, Special Assistant United States Attorneys, Social Security Administration, 6401 Security Boulevard, Baltimore, MD 21235 (for Defendant).

---

## I. INTRODUCTION

Plaintiff Kristopher T. T. brings the present case, contesting Defendant Commissioner of Social Security's denial of his applications for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and supplemental security income ("SSI") under Title XVI of the same, 42 U.S.C. § 1381 *et seq.* The parties have consented to a final judgment from the undersigned United States

---

[1] Martin J. O'Malley was sworn into office as the Commissioner of the Social Security Administration on December 20, 2023. *Commissioner*, Soc. Sec. Admin., https://www.ssa.gov/agency/commissioner/ (last accessed Mar. 26, 2024). The Court has substituted O'Malley for former Acting Commissioner Kilolo Kijakazi. *See* Fed. R. Civ. P. 25(d) (public officer's successor "automatically substituted as a party").

Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

Pursuant to the Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g) ("Supplemental Rules"), Plaintiff's challenge to the Commissioner's decision "is presented for decision" by the Court on "the parties' briefs."[2]   Fed. R. Civ. P. Supp. Soc. Sec. R. 5.   Rather than file a brief as provided in Rule 6 of the Supplemental Rules, Plaintiff filed a Motion for Summary Judgment and supporting memorandum, consistent with the procedure employed prior to the Supplemental Rules.   *See generally* ECF Nos. 19, 20.   Consistent with Rule 7 of the Supplemental Rules, the Commissioner has filed a brief, requesting that the decision of the administrative law judge ("ALJ") be affirmed. *See generally* ECF No. 22.

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's motion is denied, the Commissioner's request for relief is granted, and the ALJ's decision is affirmed.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI asserting that he has been disabled since November 2019 due to, among other things, depression, intermittent explosive disorder, anxiety disorder, obsessive compulsive disorder, and psychosis.   Tr. 18, 83-84, 101-102. Plaintiff's applications were denied initially and again upon reconsideration.   Tr. 18, 99, 117, 119-20, 123, 133, 144, 146.   Plaintiff appealed the reconsideration of his DIB and

---

[2] The Supplemental Rules went into effect on December 1, 2022.  *See, e.g.*, D. Minn. LR 7.2 Dec. 2022 advisory comm. note.

SSI determinations by requesting a hearing before an administrative law judge ("ALJ"). Tr. 18, 177-78. The ALJ held a hearing in February 2022, and issued an unfavorable decision. *See generally* Tr. 18-37, 50-81. Thereafter, Plaintiff requested review from the Appeals Council, which was denied. Tr. 1-4.

Plaintiff then filed the instant action, challenging the ALJ's decision. Compl., ECF No. 1. This matter is now ready for a determination on the briefs. *See* Fed. R. Civ. P. Supp. Soc. Sec. R. 5.

### III. MEDICAL RECORDS

Plaintiff has a history of multiple psychiatric diagnoses, including intermittent explosive disorder, depression, anxiety, psychosis, and hallucinations. *See, e.g.*, Tr. 448-50, 481-82, 497-99; *see also* Tr. 801-60. He also has a history of substance abuse. *See, e.g.*, Tr. 448-50, 481-82, 497-99. Plaintiff was previously hospitalized in connection with his mental impairments and last discharged in 2016. Tr. 482; *see also* Tr. 861-74. He also has a history of suicide attempts prior to that hospitalization. Tr. 482. In addition, Plaintiff has tried numerous medications to treat his mental impairments. *See, e.g.*, Tr. 482, 768-69; *see also* Tr. 481. Plaintiff resides in subsidized housing in connection with a mental-health program and has a case manager. Tr. 482; *see generally* Tr. 560-656.

#### A. 2018

In mid-December 2018, Plaintiff met with Brian Johns, M.D., for a psychiatric follow-up appointment.[3] Tr. 481. Dr. Johns noted that Plaintiff "developed psychosis after ingesting large quantities of an experimental drug" he obtained overseas. Tr. 481.

---

[3] Plaintiff's care was transitioned to Dr. Johns after his previous provider left the facility. *See* Tr. 801.

Plaintiff reported that he experienced auditory hallucinations "occasionally when he does not sleep or is stressed." Tr. 481. He found Haldol[4] to be helpful in addressing the hallucinations and reported that "he only needs Haldol approximately once or twice a month." Tr. 481. Dr. Johns noted that Plaintiff's hallucinations had been "far worse in the past." Tr. 481. Plaintiff also reported that he self-medicated with marijuana and cannabinoid oil. Tr. 481. Dr. Johns and Plaintiff "discussed the risk of these compounds worsening psychosis." Tr. 481. Plaintiff's primary complaint was his depression and he was interested an increased dose of pramipexole,[5] which he had found to be "very helpful for [his] mood." Tr. 481.

Dr. Johns observed that Plaintiff was oriented and casually dressed with good hygiene and eye contact. Tr. 483. His mood was "[n]ot super dysphoric but definitely dysthymic" and his affect was calm. Tr. 483. Plaintiff's speech and thought processes were normal, and he denied currently experiencing auditory or visual hallucinations. Tr. 483. Plaintiff's memory was grossly intact without formal testing and his fund of knowledge was adequate. Tr. 483. Dr. Johns described Plaintiff's insight as poor to fair and his judgment as fair. Tr. 483.

---

[4] Haldol is a brand name for haloperidol, a medication "used to treat psychotic disorders (conditions that cause difficulty telling the difference between things or ideas that are real and things or ideas that are not real)." *Haloperidol*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682180.html (last accessed Mar. 26, 2024).

[5] Among other things, pramipexole can be used to treat conditions that cause "difficulties with movement" and "works by acting in place of dopamine." *Pramipexole*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a697029.html (last accessed Mar. 26, 2024). Mirapex is a brand name for pramipexole. *Id.*

Dr. Johns made several changes to Plaintiff's medications.   He prescribed Effexor,[6] increased the dose of pramipexole, increased the dose of gabapentin,[7] discontinued clonazepam,[8] and prescribed Xanax.[9]   Tr. 483.   Dr. Johns also prescribed a mood light and noted that he previously encouraged Plaintiff to start therapy.   Tr. 483. Plaintiff was directed to return in two to three months.   Tr. 484.

**B.   2019**

In mid-February 2019, Plaintiff returned for a follow-up appointment with Dr. Johns.   Tr. 477, 756.   Plaintiff reported that he was "no longer using psychoactive substances, such as THC," just "CBD oil, which he feels helps with anxiety."   Tr. 477; *accord* Tr. 756.   Dr. Johns "review[ed] coping techniques to remain sober" and Plaintiff understood his "risk of relapse is high."   Tr. 477; *accord* Tr. 756.   Plaintiff's auditory hallucinations had "largely resolved since [his] last visit two months ago and his cessation of THC."   Tr. 477; *accord* Tr. 756.   Plaintiff reported that he took "Haldol occasionally when he feels the need to ensure he will sleep or if worried about psychosis returning due to triggers," "taking it once a month presently."   Tr. 477; *accord* Tr. 756.

---

[6] Effexor is a brand name for venlafaxine, a medication "used to treat depression." *Venlafaxine*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a694020.html (last accessed Mar. 26, 2024).
[7] Among other things, gabapentin can be used to treat certain types of "seizures by decreasing abnormal excitement in the brain." *Gabapentin*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a694007.html (last accessed Mar. 26, 2024).
[8] Clonazepam can be "used to relieve panic attacks (sudden, unexpected attacks of extreme fear and worry about these attacks)" and is in a class of medications called benzodiazepines." *Clonazepam*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682279.html (last accessed Mar. 26, 2024).  "It works by decreasing abnormal electrical activity in the brain." *Id.*  Klonopin is a brand name for clonazepam.  *Id.*
[9] Xanax is a brand name for alprazolam, a medication "used to treat anxiety disorders and panic disorder (sudden, unexpected attacks of extreme fear and worry about these attacks)." *Alprazolam*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a684001.html (last accessed Mar. 26, 2024).  "Alprazolam is in a class of medications called benzodiazepines" and "works by decreasing abnormal excitement in the brain." *Id.*

Dr. Johns encouraged him "to maintain sobriety in order to ensure success of his mental health symptoms."  Tr. 477; *accord* Tr. 756.

Plaintiff also felt that his mood was "relatively stable" and "denie[d] overt depressive symptoms," which he "attribute[d] . . . to having structured things to do with his time."  Tr. 477; *accord* Tr. 756.  Plaintiff felt the increased dose of pramipexole was helpful and did not feel a need to increase any of his antidepressant medications.  Tr. 477, 756.  Plaintiff had been unable to obtain Xanax for insurance reasons and continued taking clonazepam three times a day for his anxiety.  Tr. 477, 756.  Plaintiff reported feeling sedated and Dr. Johns encouraged him not to take this medication so frequently.  Tr. 477, 756.  Plaintiff was, however, "reluctant to make any changes regarding this regimen."  Tr. 477; *accord* Tr. 756.

Plaintiff had also spent two weeks caring for his adult disabled brother while their mother was away and recovering from an illness.  Tr. 478, 756.  "This went well."  Tr. 478; *accord* Tr. 756.

Dr. Johns made similar findings when conducting a mental status examination of Plaintiff.  *See* Tr. 479-80, 758.  Plaintiff's mood was described as "[t]oo busy to notice."  Tr. 480; *accord* Tr. 758.  Dr. Johns formally discontinued Xanax and restarted clonazepam, but otherwise maintained Plaintiff's medications at their current levels.  Tr. 480, 759.  Plaintiff was directed to return in three to four months.  Tr. 481, 759.

Plaintiff next saw Dr. Johns in mid-August.  Tr. 474, 750.  He reported that he continued to experience auditory hallucinations twice per month, for which he used Haldol, but they were "overall improved since cessation of THC."  Tr. 474; *accord* Tr.

6

750.   While Plaintiff continued to benefit from pramipexole, he reported having a "relatively low" mood and wanted to try an increase in Effexor.  Tr. 474; *accord* Tr. 750. Plaintiff also reported that he had started working for a pizza restaurant "a few months ago."  Tr. 474; *accord* Tr. 750.

Compared to prior mental status examinations, Plaintiff's mood was noted to be "bored" and his affect described as "restricted."  Tr. 476; *accord* Tr. 752.  Plaintiff was described as having "moderate hygiene and eye contact."  Tr. 476; *accord* Tr. 752. Plaintiff's thought content included "some mild" auditory hallucinations.  Tr. 476; *accord* Tr. 752.  Dr. Johns noted that Plaintiff's "[s]ubstance use remains relatively well controlled for him."  Tr. 476; *accord* Tr. 752.  Among other things, Dr. Johns increased Plaintiff's Effexor dose and directed him to return in three to four months.  Tr. 476, 754.

Towards the middle of November, Plaintiff's mother contacted a crisis line, concerned over a text message she had received from Plaintiff stating that he would not "be around for more than a month or so."  Tr. 525; *see also* Tr. 597.  Plaintiff's mother reported that it was possible he was using a controlled substance.  Tr. 525.  Plaintiff's mother additionally noted that Plaintiff had lost his job at the pizza restaurant and had stated "the voices are quiet right now and that is how I want to go out."  Tr. 525.  Mental-health professionals attempted to reach Plaintiff at his residence and were unsuccessful. Tr. 525.

When Plaintiff saw Dr. Johns again approximately two months later in mid-November, he was "struggling emotionally."  Tr. 471; *accord* Tr. 746.  Plaintiff had lost two jobs in the last several months following personality conflicts with coworkers.  Tr.

471, 746.  He was terminated from one position after an outburst and the second position after he "threatened to potentially harm [a coworker] in a letter to his manager."  Tr. 471; *accord* Tr. 746.  Plaintiff "note[d] some conflicts historically with people who are 'jerks.'"  Tr. 471; *accord* Tr. 746.

Plaintiff's mood did not improve with the increased Effexor dose and he wanted to try an additional increase.  Tr. 471, 746.  Plaintiff also wanted to try increasing pramipexole again.  Tr. 471, 746.  Dr. Johns noted that Plaintiff was not currently seeing his therapist.  Tr. 471, 746.  Plaintiff's mental status examination remained the same.  Tr. 473, 748.  Dr. Johns increased the doses of both Effexor and pramipexole and directed Plaintiff to return in two months.  Tr. 473, 748-49.

### C. 2020

When Plaintiff was next seen by Dr. Johns in mid-January 2020, he reported that his mood had improved with the increased Effexor and pramipexole doses.  Tr. 468, 742.  He also had not used Haldol recently.  Tr. 469, 742.  Plaintiff did, however, report "some increase in impulsive behaviors and spent some money on a sale for cannabinoids."  Tr. 468; *accord* Tr. 742.  Plaintiff was also "playing games on his telephone" and "wak[ing] up in the middle of the night to engage in this."  Tr. 468; *accord* Tr. 742.  Plaintiff told Dr. Johns that he "has not been looking for work and currently feels overwhelmed with just basic living arrangements."  Tr. 468; *accord* Tr. 742.  Plaintiff continued to work with his case manager.  Tr. 469, 742.

During this visit, Dr. Johns observed that Plaintiff had "poor hygiene and moderate eye contact."  Tr. 470; *accord* Tr. 742.  Plaintiff's affect remained restricted,

but his mood was "better."  Tr. 470; *accord* Tr. 744.  Plaintiff had mild psychomotor retardation.  Tr. 470, 744.  Dr. Johns also continued to note the presence of "some mild, occasional" auditory hallucinations.  Tr. 470; *accord* Tr. 744.  Dr. Johns continued Plaintiff's medications as prescribed and directed him to return in three to four months. Tr. 470-71, 745.

In March, Plaintiff was assessed for continued receipt of services through the mental-health program.  *See* Tr. 460-68, 732-41.  As part of this assessment, Plaintiff reported that his depression makes it "[v]ery difficult for him to do his work, take care of things at home, or get along with other people."  Tr. 464; *accord* Tr. 736.  Plaintiff's mood was dysthymic and his affect was flat.  Tr. 466, 738.  His eye contact, speech, attention, concentration, thought processes, and memory were normal.  Tr. 466, 738. Plaintiff's judgment and insight were both noted to be impaired.  Tr. 466, 738.  Plaintiff was diagnosed with major depressive disorder, generalized anxiety disorder, psychosis, and polysubstance abuse.  Tr. 467, 740.  Plaintiff was found eligible to continue to receive services through the mental-health program.  Tr. 468, 741.

Plaintiff's next visit with Dr. Johns occurred in mid-April and "was conducted via telehealth due to the COVID-19 pandemic."  Tr. 457; *accord* Tr. 728.  Plaintiff's "life remain[ed] largely unchanged."  Tr. 457; *accord* Tr. 728.  He continued to benefit from the increased Effexor and pramipexole doses, which he found "helpful for maintaining his euthymic mood."  Tr. 457; *accord* Tr. 728.  Plaintiff did not feel a need to change his medications and felt that "his brain [was] healing after several years of psychotic symptoms due to drug overdose."  Tr. 457 (quotation omitted); *accord* Tr. 728.  Plaintiff

reported that he had not needed Haldol for the past year and had not "had hallucinations for longer than that." Tr. 457 (quotation omitted); *accord* Tr. 728. Plaintiff thought it might "be time to start looking for another job." Tr. 457; *accord* Tr. 728. While Plaintiff still had a case manager, he had "little contact with them aside from moral support." Tr. 457 (quotation omitted); *accord* Tr. 728.

Plaintiff's affect continued to be restricted and his mood was "okay." Tr. 459. Dr. Johns noted that his auditory hallucinations had resolved. Tr. 459. Plaintiff was directed to continue with his medications as prescribed and return in three to four months. Tr. 459.

Plaintiff had another telehealth appointment with Dr. Johns in early July. Tr. 454, 724. Plaintiff reported feeling "more anxious than usual," but was uncertain as to why. Tr. 454; *accord* Tr. 724. Plaintiff had also recently ordered a substance online from overseas that he had taken in the past and found helpful, but believed a neighbor may have stolen the package. Tr. 454, 724. Dr. Johns asked Plaintiff why he did not just make an appointment to increase his clonazepam dose, and Plaintiff responded that he did not "think that would be an option." Tr. 454; *accord* Tr. 724. Dr. Johns advised Plaintiff "not to take substance[s] in addition to prescribed medications or he would risk losing those as well." Tr. 454; *accord* Tr. 724.

Plaintiff additionally reported spending time playing games on his phone and "spending money on his game" as well as "over $100 on medications from the internet." Tr. 454; *accord* Tr. 724. Plaintiff thought the pramipexole might be contributing to his spending, but he did not want to adjust the dose due to the mood benefits. Tr. 454, 724.

10

Plaintiff had also been talking with a therapist weekly, which he found helpful, and was going to "discuss his impulse control issues further with the therapist." Tr. 454; *accord* Tr. 724. Plaintiff did not feel that gabapentin was helping his anxiety and wanted to discontinue it in favor of an increased dose of clonazepam. Tr. 454, 724. Plaintiff had not "taken Haldol in months" as he had not had hallucinations. Tr. 454; *accord* Tr. 724.

Plaintiff discovered that a prior application for disability benefits had been rejected over a year ago and his case manager had put him in touch with an attorney. Tr. 454, 724. Plaintiff also had a job interview with a fast-food restaurant. Tr. 454, 724.

Plaintiff's affect continued to be restricted and his mood was "a little bit furious." Tr. 456; *accord* Tr. 726. Dr. Johns noted that Plaintiff's insight and judgment were both limited to fair. Tr. 456, 726. Dr. Johns discontinued gabapentin, increased the clonazepam dose, and directed Plaintiff to return in three months. Tr. 456, 726.

At his next appointment in early October, Plaintiff reported some fatigue from the increased clonazepam, but felt he had adjusted to it and did not always take it three times a day if he was not feeling anxious. Tr. 451, 720. Plaintiff continued to struggle with sleep due to gaming on his phone. Tr. 451, 720. He continued to remain free of auditory hallucinations. Tr. 451, 720. Plaintiff did not "follow-through with a job at [the fast-food restaurant] because he doesn't have an ID and SS card so has been working with his case manager to get those." Tr. 451; *accord* Tr. 720. Plaintiff was considering applying for other jobs or becoming a PCA for his brother. Tr. 451, 720. Plaintiff was also making better food choices and had not purchased "designer drugs online." Tr. 452; *accord* Tr. 720. Additionally, Plaintiff had reapplied for disability benefits with the

assistance of an attorney.  Tr. 451, 720.  Plaintiff's mental status examination remained largely the same with his mood being described as "not great, not awful."  Tr. 453; *see* Tr. 451; *accord* Tr. 720, 722.  Dr. Johns continued Plaintiff's medications at their current levels and directed Plaintiff to follow up in two to three months.  Tr. 453, 723.

Towards the end of December, Plaintiff contacted a crisis line due to auditory hallucinations. Tr. 520-23.   During the first call, Plaintiff reported "concerns about hearing voices over the past few days and . . . [that] he may not be able to see his family over the holidays." Tr. 523.  Plaintiff reported that it had been "a long time" since he had heard voices.  Tr. 523.  Plaintiff was not currently taking his medication.  Tr. 523. During a follow-up call two days later, Plaintiff reported that he had taken some old Haldol and felt better.  Tr. 520, 521.  It was noted that Plaintiff had an upcoming appointment with Dr. Johns in two weeks.  Tr. 521.  Plaintiff was described as "brief, superficial, guarded, and minimizing his symptoms."  Tr. 521.  His thought processes were "rambling" and his insight and judgment were fair.  Tr. 521.

**D.  2021**

Plaintiff had a telehealth appointment with Dr. Johns in early January 2021.  Tr. 530.  Plaintiff's chief complaints were hallucinations, depression, and anxiety. Tr. 530. Plaintiff described his mood as "kinda a roller coaster."  Tr. 530.  Plaintiff told Dr. Johns that, before Christmas, he experienced auditory hallucinations "at 7/10."  Tr. 530. Plaintiff reported that it had "been 2 years since the last episode."  Tr. 530.  Plaintiff believed the hallucinations were possibly caused by "not eating and sleeping."  Tr. 530.

Plaintiff also reported "taking kratom for pain," which "may have contributed."[10]   Tr. 530.  Plaintiff noted that he "took Haldol and started eating regularly as well."  Tr. 530.  Dr. Johns noted that both Plaintiff's therapist and caseworker were currently on vacation.  Tr. 530.  Plaintiff was interested in increasing his dose of Wellbutrin.[11]  Tr. 530.

Plaintiff's mental status examination was similar to previous examinations with his mood being described as "up and down."  Tr. 532.  Dr. Johns increased the Wellbutrin dose and directed Plaintiff to return in three months.  Tr. 532-33.

Plaintiff had another telehealth appointment with Dr. Johns in mid-February.  Tr. 542, 716.  Plaintiff did not notice a difference with the increased dose of Wellbutrin and his mood continued to be up and down.  Tr. 542, 716.  Plaintiff had not had any auditory hallucinations since the prior visit.  Tr. 542, 716.  Dr. Johns noted that Plaintiff had "stopped playing his online phone game and deleted it," which "was a huge step for [Plaintiff], as he was very addicted to it and has been going through 'withdrawals.'"  Tr. 542; *accord* Tr. 716.  Dr. Johns again increased Plaintiff's Wellbutrin dose and directed him to return in three months.  Tr. 545, 719.

In early May, Plaintiff presented to the emergency room for auditory hallucinations.  Tr. 660.  Plaintiff reported that the voices had "drastically increased as of late" and had "also caused issues with keeping up on taking his medications."  Tr. 660.  Plaintiff reported that he considered taking "all of his clonazepam" to try to silence them.

---

[10] Kratom "commonly refers to an herbal substance that can produce opioid- and stimulant-like effects."  *Kratom*, Nat'l Inst. on Drug Abuse, https://nida.nih.gov/research-topics/kratom (last accessed Mar. 26, 2024).  "Kratom and kratom-based products are currently legal."  *Id.*

[11] Wellbutrin is a brand name for bupropion, a medication used to treat depression and seasonal affective disorder.  *Bupropion*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a695033.html (last accessed Mar. 26, 2024).

Tr. 660.  Plaintiff additionally reported that alcohol use made the voices worse and, "a couple weeks ago he drank 750ml of vodka," which caused the voices to get worse.  Tr. 662; *see* Tr. 762 ("did drink to black out a couple of times with hard alcohol").  This was a "significant increase" from his usual consumption.  Tr. 662.  Plaintiff also reported increased anxiety, which he described as "pent up energy," and said he was "doing pushups in the ED lobby."  Tr. 662.  Plaintiff had been unable to connect with his case manager or therapist due to a broken cell phone.  Tr. 662-63; *see* Tr. 673.

Plaintiff was noted to have a "flat affect" and "depressed mood."  Tr. 668. Plaintiff remained overnight and was discharged the following day.  Tr. 669, 671-72. Plaintiff improved with medication and was "feeling much better" with a decrease in his auditory hallucinations at the time of discharge.  Tr. 672.

In mid-May, Plaintiff had another telehealth appointment with Dr. Johns.  Tr. 762. Plaintiff discussed his recent episode, noting that he had been having auditory hallucinations on a daily basis in the month leading up to his emergency room visit.  Tr. 762.  Plaintiff reported that the voices did not "want him to take medications."  Tr. 762. Plaintiff told Dr. Johns that he received Abilify[12] at the hospital, has continued taking it, and found it to be helpful with his mood.  Tr. 762.  Plaintiff reported that he felt "very depressed" prior to the auditory hallucinations.  Tr. 762.  Plaintiff's sleep was also poor at the time of the hallucinations, but had since improved.  Tr. 762.

---

[12] Abilify is a brand name for aripiprazole, a medication that can be used to treat schizophrenia, among other things, and in conjunction with other medications "to treat depression when symptoms cannot be controlled by the antidepressant alone."  *Aripiprazole*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/ a603012.html (last accessed Mar. 26, 2024).

14

Plaintiff was interested in trying to increase Effexor.  Tr. 762.  He had also stopped taking pramipexole "due to the [auditory hallucinations]."  Tr. 762.  Plaintiff was concerned about continuing with this medication as, when he restarted it, "he became obsessed with video games again."  Tr. 762.  Plaintiff had also stopped taking Wellbutrin, but was interested in restarting this medication.  Tr. 762.

Dr. Johns noted that Plaintiff's memory was impaired and his attention decreased. Tr. 764.  Plaintiff's mood was also low and he had high anxiety.  Tr. 764.  Dr. Johns increased Plaintiff's Effexor dose, restarted Wellbutrin, and formally discontinued pramipexole.  Tr. 764.

In mid-June, Plaintiff began treating with Joseph A. Hanson, D.O., via telehealth. Tr. 688, 712; *see* Tr. 545, 719 (noting care transfer).  Plaintiff told Dr. Hanson that his "psychotic episode" lasted approximately three weeks and "[t]he triggering events were sleep deprivation and stress in his life."  Tr. 688; *accord* Tr. 712.  Plaintiff reported that "he was having visual hallucinations that look like characters of people that were close to him and they were saying negative things about him."  Tr. 688; *accord* Tr. 712.  Plaintiff stated he was given Abilify in the hospital and, after continuing with this medication, he "noticed a total resolution of his psychotic symptoms" over the course of several days. Tr. 688; *accord* Tr. 712.  Plaintiff had "been stable for over 2 weeks now," was "sleeping well," and had "a good appetite."  Tr. 688; *accord* Tr. 712.

Dr. Hanson noted that Plaintiff was alert and oriented, had good concentration, and normal thought processes.  Tr. 689, 713.  Plaintiff's affect was appropriate and his mood was euthymic.  Tr. 689, 713.  Plaintiff also had good insight and judgment.  Tr.

689, 713.  Dr. Hanson prescribed Abilify, continued Plaintiff's other medications, and directed him to follow up in one month.  Tr. 690, 714.

When he followed up with Dr. Hanson a month later, Plaintiff reported that "he now only hears murmur in the voice" and cannot make out what the voice is saying.  Tr. 685; *accord* Tr. 709.  Plaintiff reported being compliant with his medications and denied any side effects.  Tr. 685, 709.  Plaintiff wanted "to make more time to read now that he is feeling better."  Tr. 685; *accord* Tr. 709.  "On good days," Plaintiff was "productive and [able to] get himself to do yoga or some form of exercise to create structure in his day."  Tr. 685; *accord* Tr. 709.  He was also sleeping regularly and had a good appetite.  Tr. 685, 709.  Unlike the previous visit, Dr. Hanson described Plaintiff's mood as depressed, his insight poor, and his judgment fair.  Tr. 686, 710.  Dr. Hanson increased Plaintiff's Effexor dose and continued his other medications at existing levels.  Tr. 687, 711.  Plaintiff was to follow up in three months.  Tr. 687, 711.

Plaintiff met with Dr. Johns via telehealth in mid-October.  Tr. 766.  Dr. Johns noted that Plaintiff was continuing to see Dr. Hanson.  Tr. 766.  Plaintiff reported that, following his episode of psychosis, he "had been feeling good through the summer until recently."  Tr. 766.  Plaintiff noted some weight gain with Abilify.  Tr. 766.  Plaintiff also experienced mild auditory hallucinations occasionally and his mood remained low with fleeting suicidal ideation despite the increase in medication.  Tr. 766.  Plaintiff was

interested in trying ketamine injections and transcranial magnetic stimulation ("TMS")[13] as possible treatment options.  Tr. 766.

Dr. Johns' examination findings remained unchanged.  *See* Tr. 770-71.  Dr. Johns noted that Plaintiff "has a long history of depression" and was currently experiencing "severe, treatment resistant depression."  Tr. 771.  Dr. Johns noted that Plaintiff had "failed numerous antidepressants" and "treated with psychotherapy without resolution of depression."  Tr. 771.  Dr. Johns continued Plaintiff's existing medications, prescribed a course of ketamine injections for three weeks, and authorized TMS.  Tr. 771.

During the next telehealth appointment with Dr. Hanson in early November, Plaintiff reported feeling more depressed lately, which he attributed to the change in seasons.  Tr. 706.  Plaintiff had "a sad light" and said "he will be trying to use it more." Tr. 706.  Plaintiff had also undergone "a few courses of IV ketamine infusions," which he felt helped his mood, but "he still endorse[d] significant feelings of depression."  Tr. 706. Plaintiff's appetite and sleep were "fair."  Tr. 706.  Plaintiff denied experiencing any hallucinations.  Tr. 706.

Plaintiff's mental status examination was overall a bit better this time.  Although his mood remained depressed, his insight and judgment were good.  Tr. 708.  Dr. Hanson increased Plaintiff's Abilify dose and continued his remaining medications.  Tr. 708. Plaintiff was directed to follow up in three months.  Tr. 708.

---

[13] "TMS uses magnetic fields to stimulate nerve cells in the brain to improve symptoms of depression." *Transcranial Magnetic Stimulation (TMS) – Treatment for Depression*, U.S. Dep't of Veterans Affairs, https://www.va.gov/montana-health-care/programs/transcranial-magnetic-stimulation-tms-treatment-for-depression/ (last accessed Mar. 26, 2024).

Plaintiff had another telehealth appointment with Dr. Hanson the following month. Tr. 703.  Both his mood and hallucinations were better.  Tr. 703.  Plaintiff reported that "his auditory hallucinations have decreased and at one point he was not hearing any."  Tr. 703; *see* Tr. 703 ("jokingly states that he thought the voices were finished").  Plaintiff described his depression as "slightly improved."  Tr. 703.  Plaintiff had some concerns about weight gain, and indicated that he would try to get outdoors more and stay active. Tr. 704.  Dr. Hanson noted that Plaintiff's mood was euthymic.  Tr. 704.  Plaintiff's medications were continued at their current levels and he was again directed to follow up in three months.  *Compare* Tr. 705 *with* Tr. 708.

A few days later, Plaintiff also had a telehealth appointment with Dr. Johns.  Tr. 773.  Plaintiff felt that his mood was improving with the ketamine injections, but "[h]e continues to play online games incessantly."  Tr. 773.  Plaintiff continued to spend time helping his brother and was "paid to be his brother's PCA."  Tr. 773.  Plaintiff experienced additional weight gain with an increased dose of Abilify, but the medication continued to be helpful in managing his auditory hallucinations.  Tr. 773.

Compared to prior findings, Dr. Johns noted that Plaintiff's memory was intact, but his attention was decreased.  Tr. 774.  Plaintiff's mood and anxiety were both improving.  Tr. 774.  Dr. Johns reviewed Plaintiff's history of psychosis with him at length and concluded that Plaintiff met the criteria for schizoaffective disorder, depressive type.  Tr. 773, 774.  Dr. Johns added Topamax[14] to Plaintiff's medication

---

[14] Topamax is a brand name for topiramate, a medication often used for the treatment of certain seizures, but "also sometimes used for the management of alcohol dependence and for the treatment of binge eating disorder."

regimen to address the weight gain, but otherwise did not make changes to Plaintiff's treatment plan. Tr. 774; *see* Tr. 777-98 (continued ketamine therapy).

### E. Scott Kamilar

From at least November 2018 through December 2021, Plaintiff appears to have regularly attended therapy with Scott Kamilar. *See* Tr. 509-13, 536, 679-80, 700; *cf.* Tr. 857 (treatment note from January 2017 stating Plaintiff sees Kamilar "for regular counseling and has been seeing him for many years"). As the ALJ noted, Kamilar's "notes are handwritten and difficult to read." Tr. 31. Generally speaking, they appear to contain a few short notes from each visit, often less than a sentence or two in length.

## IV. OPINION EVIDENCE

### A. Dr. Johns

In March 2021, Dr. Johns completed a mental capacity assessment.[15] *See* Tr. 551-53. The form asked Dr. Johns to rate Plaintiff's degree of limitation in understanding, remembering, or applying information; concentration, persistence, or maintaining pace; adapting or managing oneself; and interacting with others. Tr. 551-53. After each section, the form asked for the medical/clinical findings supporting the assessment. Tr. 551-53.

As for understanding, remembering or applying information, Dr. Johns opined that Plaintiff had moderate limitation in his ability to follow one or two-step oral instructions to carry out a task and in his ability to recognize a mistake, correct it, or identify and

---

*Topiramate*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a697012.html (last accessed Mar. 26, 2024).

[15] Dr. Johns also completed a physical assessment. Tr. 549-50. Only Plaintiff's mental impairments are at issue here.

solve problems.  Tr. 551.  Plaintiff had marked limitation in his ability to sequence multi-step activities.  Tr. 551.  Plaintiff had extreme limitation in his ability to use reason and judgment to make work-related decisions.  Tr. 551.  Dr. Johns did not complete the medical/clinical findings section here.

With respect to concentrating, persisting, or maintaining pace, Plaintiff had moderate limitation in his abilities to initiate and perform a known task and to work at an appropriate and consistent pace/complete tasks in a timely manner.  Tr. 552.  Plaintiff had marked limitation in his abilities to ignore or avoid distractions while working and to work closely to or with others without interrupting or distracting them.  Tr. 552.  Plaintiff had extreme limitation in his abilities to sustain an ordinary routine with regular attendance at work and to work a full day without needing more than customary rest periods.  Tr. 552.  Dr. Johns also did not complete the medical/clinical findings section here.

As for adapting and managing oneself, Plaintiff had moderate limitation in his ability to make plans independent of others.  Tr. 552.  Plaintiff had marked limitation in his abilities to adapt to change; distinguish between acceptable and unacceptable work performance; set realistic goals; and be aware of normal hazards and take appropriate precautions.  Tr. 552.  Plaintiff had extreme limitation in his abilities to manage psychologically based symptoms and to maintain appropriate personal hygiene and attire.  Tr. 552.  Here, Dr. Johns explained that Plaintiff had a history of "psychosis and poor insight and judgement, as well as personality conflicts with others."  Tr. 552.  Dr. Johns noted that Plaintiff "has ongoing depression, anxiety, poor focus, concentration, attention

and memory." Tr. 552.  Dr. Johns also noted that Plaintiff has limited daily activities. Tr. 552.

With respect to interacting with others, Plaintiff had moderate limitation in his abilities to cooperate with others and ask for help when needed.  Tr. 553.  Plaintiff had marked limitation in his abilities to understand and respond to social cues and to respond to requests, suggestions, criticism, correction, and challenges.  Tr. 553.  Plaintiff had extreme limitation in his abilities to handle conflict with others and to keep interactions free from excessive irritability, sensitivity, argumentativeness, or suspiciousness.  Tr. 553.  As for the medical/clinical findings, Dr. Johns wrote: "See above."  Tr. 553.

Dr. Johns additionally noted that Plaintiff had a history of obtaining legal substances online from overseas, "resulting in psychosis and likely permanent impartment." Tr. 553.

### B.  State Agency Psychological Consultants

Both initially and on reconsideration, the state agency psychological consultants found that Plaintiff had no understanding or memory limitations, but did have some limitation in the areas of concentration and persistence, social interaction, and adaptation. *See* Tr. 94-97, 112-15, 131-32, 142-43.  The state agency psychological consultants opined that, based on Plaintiff's psychological symptoms, inattention, personality issues, and limited coping skills, Plaintiff would be able to "concentrate, persist and keep pace for detailed tasks with brief, superficial interaction with others" and "would do best with low workplace changes, pressures and responsibilities."  Tr. 95, 97; *accord* Tr. 113, 115, 131, 132, 142, 143; *see also* Tr. 96 ("brief, superficial interaction with public and

others"); *accord* Tr. 114, 132, 143.   At both stages, the state agency psychological consultants noted that Plaintiff reported his symptoms were stable with ongoing treatment.  Tr. 97, 132, 115, 143.

On reconsideration, the state agency psychological consultant noted the following with respect to Dr. Johns' opinion:

> [This opinion] is now dated and is not fully persuasive, supported, or consistent.  [Plaintiff] has reported difficulties holding jobs due [to] interpersonal conflicts at work. However, he has been generally cooperative at visits and appears able to sustain attention/concentration adequately for activities of interest such as video games and yoga.  [Plaintiff] was evaluated overnight in the [emergency room in April 2021] . . . for worsening [auditory hallucinations], which he attributed to life stressors and sleep deprivation.  He endorsed [suicidal ideation] with an intention to [overdose] on prescribed medication.  [His] condition improved with treatment and he declined admission.  [Plaintiff] has subsequently established care with another psychiatrist and his [mental-health] conditions are generally described as stable on his current medications.  Overall, [Dr. Johns' opinion] is overly restrictive with regard to [Plaintiff's] limitations in social functioning, stress tolerance, and concentration/persistence/pace.  [Plaintiff] has no recent psychiatric hospitalizations and has denied recent [suicidal ideation/homicidal ideation].  [Plaintiff] has denied a history of [chemical dependency] treatment.  While motivation appears to be limited, he has reported at recent visits compliance with prescribed medications.

Tr. 129; *accord* Tr. 140.

## V. HEARING TESTIMONY

At the hearing, Plaintiff testified that he currently lived on his own in an apartment and had lived by himself for almost ten years.  Tr. 55.  Plaintiff received rental assistance and participated in other assistance programs. Tr. 55-56.  Plaintiff testified that his case

22

manager generally assisted him with completing the necessary forms as he would become overwhelmed by the process.  Tr. 69-70.

When asked how his psychological impairments affected his ability to work, Plaintiff testified that his symptoms were unpredictable and severe enough to "render[ him] unable to work completely."  Tr. 60.  Plaintiff still experienced auditory hallucinations occasionally, describing them as "just a sentence or two every day or two" and typically when he was trying to fall asleep.  Tr. 71.  Plaintiff testified that he was currently on several medications and recalled that his last hospitalization was in approximately April 2021.  Tr. 63.  Plaintiff testified that he tried ketamine therapy for approximately three months, with his last injection occurring approximately three weeks prior, but stopped because they were not helping.  Tr. 64.  Plaintiff also testified that he had been terminated from previous employment due to an inability to get along with others.  Tr. 68.

Additionally, Plaintiff testified that he has been working as a PCA for his brother since 2021.  Tr. 57.  Plaintiff worked approximately 20 hours per month providing services for his brother, stepping in when his mother was not able to be home.  Tr. 57-58. Plaintiff testified that his responsibilities primarily involved keeping an eye on his brother to prevent "him from doing things he shouldn't be doing."  Tr. 59.  Plaintiff testified that he did not believe his psychological impairments significantly impacted his ability to care for his brother and, if he thought that were the case on a given day, he would let his mother know.  Tr. 65-66.  Plaintiff acknowledged, however, that at one point he was a co-guardian for his brother, but his mother made the decision to "revoke[] it."  Tr. 70.

# VI. ALJ'S DECISION

The ALJ found that Plaintiff had the severe impairments of intermittent explosive disorder; dysthymia; major depressive disorder; generalized anxiety disorder; schizoaffective disorder, depressive type; and alcohol and polysubstance use disorders. Tr. 21. The ALJ concluded that these impairments did not individually or in combination meet or equal a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1. Tr. 21-22. As to Plaintiff's residual functional capacity, the ALJ concluded that Plaintiff had the residual functional capacity to perform work at all exertional levels with the following non-exertional limitations:

> he can perform simple, routine, and repetitive tasks, but not at a production rate pace (so, for example, no assembly line work); can respond appropriately to occasional interaction with supervisors and co-workers, but should have no team or tandem work with co-workers and no interaction with the general public; and can tolerate few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work environment.

Tr. 25. In reaching this residual-functional-capacity determination, the ALJ found Dr. Johns' opinion to be unpersuasive. *See* Tr. 33-34.

Based on Plaintiff's age, education, work experience, and residual functional capacity as well as the testimony of a vocational expert, the ALJ found that Plaintiff was capable of performing the representative jobs of kitchen helper, routing clerk, and document preparer. Tr. 36. Accordingly, the ALJ concluded that Plaintiff was not under a disability. Tr. 36-37.

## VII. ANALYSIS

This Court's "task is to determine whether the ALJ's decision complies with the relevant legal standards and is supported by substantial evidence in the record as a whole." *Lucus v. Saul*, 960 F.3d 1066, 1068 (8th Cir. 2020) (quotation omitted); *accord Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Lucus*, 960 F.3d at 1068 (quotation omitted).

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations." *Biestek*, 139 S. Ct. at 1154 (quotation omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see, e.g.*, *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018) (defining "substantial evidence as less than a preponderance but enough that a reasonable mind would find it adequate to support the conclusion" (quotation omitted)).

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011); *see Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021). The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Boettcher*, 652 F.3d at 863; *accord Grindley*, 9

F.4th at 627; *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012).  "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole."  *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted).  Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision."  *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability.  42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901.  An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).  This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience.  42 U.S.C. § 423(d)(2)(A); *accord* 42 U.S.C. § 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

Disability is determined according to a five-step, sequential evaluation process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. §§ 404.1512(a), 416.912(a).

Plaintiff asserts that the ALJ erred in determining his residual functional capacity by not properly considering Dr. Johns' opinion.

## A. Residual Functional Capacity

A claimant's "residual functional capacity is the most [he] can do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (same); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."); *see also, e.g.*, *Schmitt v. Kijakazi*, 27 F.4th 1353, 1360 (8th Cir. 2022). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 27 F.4th at 1360.

At the same time, the residual-functional-capacity determination "is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records." *Norper v. Saul*, 964 F.3d 738, 744 (8th Cir. 2020); *see Perks*, 687 F.3d at 1092; *see also* 20 C.F.R.

27

§§ 404.1546(c), 416.946(c). "An ALJ determines a claimant's [residual functional capacity] based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or her] limitations." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quotation omitted); *accord Schmitt*, 27 F.4th at 1360; *Norper*, 964 F.3d at 744-45. As such, there is no requirement that a residual-functional-capacity determination "be supported by a specific medical opinion." *Schmitt*, 27 F.4th at 1360 (quotation omitted). Nor is an ALJ "limited to considering medical evidence exclusively." *Id.* (quotation omitted). Accordingly, "[e]ven though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 27 F.4th at 1360; *see* 20 C.F.R. §§ 404.1546(c), 416.946(c). Plaintiff bears the burden to establish his residual functional capacity. *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016).

### B. Evaluation of Opinion Evidence

The evaluation of opinion evidence is governed by the criteria set forth in 20 C.F.R. §§ 404.1520c and 416.920c. Although the opinion of a treating provider, Dr. Johns' opinion is not entitled to special deference. *Bowers v. Kijakazi*, 40 F.4th 872, 875 (8th Cir. 2022); *see* 20 C.F.R. §§ 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources."), 416.920c(a) (same).

> Instead, ALJs evaluate the persuasiveness of medical opinions by considering (1) whether they are supported by objective medical evidence, (2) whether they are consistent with other medical sources, (3) the relationship that the source has with the claimant, (4) the source's specialization, and (5) any other relevant factors.

*Bowers*, 40 F.4th at 875; *accord Austin v. Kijakazi*, 52 F.4th 723, 728 (8th Cir. 2022); *see generally* 20 C.F.R. §§ 404.1520c(c), 416.920c(c) (listing factors).

"The first two factors—supportability and consistency—are the most important." *Bowers*, 40 F.4th at 875; *accord Austin*, 52 F.4th at 723; *see* 20 C.F.R. §§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2).   With respect to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be."  20 C.F.R. § 404.1520c(c)(1); 20 C.F.R. § 416.920c(c)(1) (same). As for consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be."  20 C.F.R. § 404.1520c(c)(2); 20 C.F.R. § 416.920c(c)(2) (same).  The regulations provide that the ALJ "will explain how [he or she] considered the supportability and consistency factors for a medical source's opinions in [the] . . . decision."  20 C.F.R. § 404.1520c(b)(2); 20 C.F.R. § 416.920c(b)(2) (same); *see, e.g.*, *Bonnett v. Kijakazi*, 859 F. App'x 19, 20 (8th Cir. 2021) (per curiam) ("ALJ must explain how both supportability and consistency factors are considered").

## C.  Consideration of Dr. Johns' Opinion

When evaluating the opinion evidence, the ALJ found that Dr. Johns' opinion was not persuasive.  *See* Tr. 33-34.  The ALJ noted that, although

> this opinion was based on regular examination of [Plaintiff] in
> the course of treatment, . . . [Plaintiff's] visits were at 3- to 4-
> month intervals or longer and the conclusions about marked
> and extreme limitations in most areas of mental functioning
> are not supported by the whole body of evidence regarding
> the claim period, including the current psychiatric treatment
> records.

Tr. 34.  The ALJ also recited the comments of the state agency psychological consultant

on reconsideration and stated that "[t]he medical evidence of record received into the

record since the reconsideration review shows a stable condition since that time, and

remains fully consistent with their analysis of the inconsistencies between the opinion of

Dr. Johns and the medical evidence of record regarding [Plaintiff's] functioning during

the present claim period."  Tr. 34.

Plaintiff does not assert that the ALJ failed to follow the applicable regulations.

Instead, Plaintiff asserts that the ALJ's "reasoning is grossly inadequate."  Pl. Mem. in

Supp. at 11, ECF No. 20.  Plaintiff asserts that the record reflects he regularly sought

treatment for his mental impairments and the finding that these impairments were stable

ignores evidence to the contrary.  According to Plaintiff, "there is ample evidence in this

case that [his] numerous mental[-]health diagnoses cause him very serious limitations

such that he could not function in any full-time work setting."  Pl. Mem. in Supp. at 11.

Plaintiff asserts that "Dr. Johns has been [his] treating psychiatrist for many years"

and his "opinion is well-supported by his treatment notes and consistent with the record."

Pl. Mem. in Supp. at 9.  He additionally asserts that he "has an excellent and continuous

record of treatment" with his case manager, therapist, and Dr. Johns during the relevant

period and "[t]he ALJ's claim that Dr. Johns has a sporadic/irregular treating history with

[him] is false." Pl. Mem. in Supp. at 12. Plaintiff likewise asserts that "it is unreasonable to allow the ALJ to use frequency of treatment with Dr. Johns—particularly as here, during the COVID-19 Pandemic—as a basis for discounting Dr. Johns['] opinion, while accepting the opinion of sources who have never examined Plaintiff." Pl. Mem. in Supp. at 12. Plaintiff also asserts that the ALJ improperly relied on the state agency psychological consult's characterization of Dr. Johns' opinion as "dated" on reconsideration when the opinion was issued just six months earlier. Pl. Mem. in Supp. at 13.

First, contrary to Plaintiff's assertion, the ALJ did not find that he had "a sporadic/irregular treating history" with Dr. Johns. Pl. Mem. in Supp. at 12. Indeed, the ALJ noted that Dr. Johns' opinion was "based on regular examination of [Plaintiff] in the course of treatment." Tr. 33. The ALJ then permissibly took into account the frequency with which Plaintiff saw Dr. Johns, accurately noting that these appointments were often three to four months apart, compared to the marked and extreme limitations set forth in Dr. Johns' opinion. Plaintiff points to a decision from the Northern District of Iowa wherein the district court disagreed with an ALJ's characterization of psychiatric treatment occurring "anywhere from four weeks to four months" apart as "relatively infrequent." *Sidney v. Kijakazi*, 630 F. Supp. 3d 1077, 1093-94 (N.D. Ia. 2022). But, whether it is possible to view the frequency of Plaintiff's appointments differently is not the relevant question. *See Nash*, 907 F.3d at 1089; *see also Sidney*, 630 F. Supp. 3d at 1093.

Second, again contrary to Plaintiff's assertion, the ALJ did not find Dr. Johns' opinion to be unpersuasive because a state agency psychological consultant found it to be "dated." Pl. Mem. in Supp. at 13. A careful reading of the ALJ's decision reflects that the ALJ was summarizing the comments of the state agency psychological consultant on reconsideration, which included the consultant's opinion that Dr. Johns' "opinion was now outdated." Tr. 34. The salient part of the ALJ's analysis comes, however, after this summary, wherein the ALJ explains that "[t]he medical evidence received into the record since the reconsideration review shows a stable condition since that time, and remains fully consistent with their analysis of the inconsistencies between the opinion of Dr. Johns and the medical evidence of record regarding [Plaintiff's] functioning during the present claim period." Tr. 34. Thus, the ALJ did not find Dr. Johns' opinion to be unpersuasive because of the age of the opinion, but because the marked and extreme limitations contained in the opinion were inconsistent with other medical evidence in the record, including the more recent psychiatric treatment records.

Fundamentally, Plaintiff asserts that his medication regimen "has been unsuccessful in treating his symptoms" and the record reflects that he "has repeatedly tried and failed to hold low-level jobs because he inevitably gets into verbal confrontations with coworkers and mangers." Pl. Mem. in Supp. at 10. Plaintiff asserts that the ALJ did "not cite to the record" when concluding that Plaintiff was generally stable on his medications as of 2021 and "[a] lack of suicidal or homicidal ideation is not a reasonable basis for denying disability." Pl. Mem. in Supp. at 14. Plaintiff asserts that

Dr. Johns' decision to pursue TMS and ketamine therapy to address the symptoms of his mental impairments reflects that these conditions were far from stable.

Here too, Plaintiff's assertion that the ALJ "omit[ted] evidence refuting the assertion of stability" is incorrect.  Pl. Mem. in Supp. at 14.  When discussing the medical evidence, the ALJ discussed how there were times when Plaintiff experienced "breakthrough psychotic symptoms."  Tr. 28; *see, e.g.*, Tr. 28 ("breakthrough symptoms about twice a month"), 30 ("had been having auditory hallucinations").  The ALJ contextualized these episodes, pointing out that they tended to occur when Plaintiff was using non-prescribed substances and not sleeping and eating regularly.  Plaintiff's psychotic episodes resolved with medication and he reported improvements in his mood with medication adjustments.  *See Hensley v. Colvin*, 829 F.3d 926, 933-34 (8th Cir. 2016) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.").

Nor was it outside the zone of choice for the ALJ to find that Plaintiff's condition overall remained stable since his April 2021 episode.  In mid-June 2021, Dr. Hanson noted that Plaintiff had been stable for over two weeks.  The following month, Plaintiff reported feeling better despite occasionally hearing a "murmur."  Tr. 685; *accord* Tr. 709.  Plaintiff told Dr. Johns a few months later that he "had been feeling good" up until recently with the change in seasons and experienced mild auditory hallucinations occasionally.  Tr. 766.  And while Plaintiff reported feeling more depressed in November, he told both Dr. Hanson and Dr. Johns that he was doing better in December.

Thus, the more recent psychiatric records reflect that Plaintiff's symptoms and functioning improved with medication.

Similarly, while Plaintiff emphasizes that he was diagnosed with "treatment resistant depression," Pl. Mem. in Supp. at 10, 14, the fact that Plaintiff continued to have medically documented impairments during this time "does not perforce result in a finding of disability," *Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004). Even if this characterization of Plaintiff's depression combined with Dr. Johns' notation that Plaintiff had "failed numerous antidepressants" and the treatment decision to pursue TMS and ketamine therapy could support an alternative conclusion, this alone does not warrant reversal. *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017) ("[W]e will not reverse simply because some evidence supports a conclusion other than that reached by the Commissioner."). Moreover, the ALJ considered other evidence in the record indicating Plaintiff overall exhibited greater functioning than reflected in Dr. Johns' opinion. Among other things, the ALJ noted that Plaintiff lived on his own in an apartment and was working at least part time as a PCA for his brother. "Despite [Plaintiff's] dissatisfaction with how the ALJ weighed the evidence, it is not this Court's role to reweigh that evidence." *Schmitt*, 27 F.4th at 1361.

Lastly, although the ALJ did not find Dr. Johns' opinion to be persuasive, the ALJ did include limitations in the residual functional capacity related to Plaintiff's mental impairments, including difficulties getting along with others. The ALJ limited Plaintiff to "simple, routine, and repetitive tasks" to "address the complaints of difficulty with focus and periods of diminished attention and concentration in mental status examinations."

Tr. 27.  The ALJ included limitations regarding pace (no "production rate pace") and variability ("few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work environment") to "address moderate difficulties with adapting and managing the self."  Tr. 25, 27.  The ALJ also limited Plaintiff's "interaction with others" to address the difficulties he experienced in previous employment situations while also taking into account that he was able to interact with others in other settings, including with his brother, case manager, and treatment providers.  Tr. 27.

In sum, there is substantial evidence in the record as a whole to support the ALJ's conclusion that Dr. Johns' opinion was unpersuasive.

## VIII. ORDER

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1.  Plaintiff's Motion for Summary Judgment, ECF No. 19, is **DENIED**.

2.  The Commissioner's request for relief, ECF No. 22, is **GRANTED**.

3.  The ALJ's decision is **AFFIRMED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March  26  , 2024                          _s/ Tony N. Leung_
                                                  Tony N. Leung
                                                  United States Magistrate Judge
                                                  District of Minnesota

                                                  _Kristopher T. T. v. O'Malley_
                                                  Case No. 23-cv-359 (TNL)

35